STATE of Wisconsin, Plaintiff-Appellant,

v.

David W. STEVENS,
Defendant-Respondent-Petitioner.

Supreme Court

*No. 2009AP2057–CR. Oral argument October 7, 2011.
—Decided July 13, 2012.*

2012 WI 97

(Also reported in 819 N.W.2d 798.)

160

For the defendant-respondent-petitioner, there were briefs filed by *Paul LaZotte,* assistant state public defender, and oral argument by *Paul LaZotte.*

For the plaintiff-respondent, the cause was argued by *Sally L. Wellman* and the brief was filed by *Mark A. Neuser,* assistant attorneys general, with whom on the brief was *J.B. Van Hollen.*

¶ 1. DAVID T. PROSSER, J. This is a review of an unpublished decision of the court of appeals, *State v. Stevens,* No. 2009AP2057–CR, unpublished slip op. (Wis. Ct. App. Nov. 17, 2010). The Circuit Court for Waukesha County, Robert G. Mawdsley, Judge, suppressed an incriminating statement that David W. Stevens (Stevens) made to police during custodial interrogation. The court of appeals reversed, holding that even though Stevens invoked his right to counsel during questioning, he later initiated conversation with his police interrogator and thereafter knowingly, intelligently, and voluntarily waived his rights before making the incriminating statement. *Id.,* ¶ 18.

¶ 2. The issues presented for review are (1) whether any of the constitutional protections recognized in *Miranda v. Arizona,* 384 U.S. 436 (1966), were violated under the unusual facts of this case, and (2) whether the court of appeals was correct in disre-

161

garding *State v. Middleton,* 135 Wis. 2d 297, 399 N.W.2d 917 (Ct. App. 1986) in its analysis, on grounds that *Middleton* was overruled by *State v. Anson,* 2005 WI 96, 282 Wis. 2d 629, 698 N.W.2d 776.

¶ 3. The facts giving rise to this review may be summarized as follows: The suspect was arrested and taken into police custody. After receiving a *Miranda* warning and waiving his *Miranda* rights, the suspect began to answer questions. He then invoked his right to counsel and the questioning ceased. When the police interrogator escorted the suspect back to his holding cell, the suspect initiated a request to continue the interrogation "to clear [the] matter up." He said he would be willing to waive his right to an attorney. Instead of resuming questions, the police interrogator left the police station on other business. During the interrogator's absence, the suspect did not ask for his attorney or request that someone contact an attorney for him. However, before the interrogator returned, the suspect's attorney on a prior charge arrived at the police station and asked to see the suspect. She was refused access by an officer who was unaware of any of the conversations between the suspect and the absent police interrogator, including the suspect's request for counsel. After the attorney left, the police interrogator returned to the police station to resume the questioning —after first administering a new *Miranda* warning to the suspect and receiving a waiver of the suspect's *Miranda* rights. In the ensuing interrogation, the suspect made an incriminating statement. He was not aware when he made the statement that his attorney on the prior charge had visited the police station and tried to see him.

¶ 4. We conclude that David Stevens withdrew his request for an attorney by voluntarily initiating a

request to resume the questioning. He knowingly, intelligently, and voluntarily provided an incriminating statement to his interrogator after he was given a second *Miranda* warning. Although Stevens validly invoked his right to counsel, he cancelled his invocation of that right by initiating a dialogue in which he asked to continue the interrogation. This cancellation of the request for counsel was confirmed by the fact that Stevens made no effort to secure counsel while his interrogator was absent, by his recorded agreement that he initiated the conversation asking to resume questioning, and by his waiver of the right to counsel after receiving a second *Miranda* warning.

¶ 5. We also conclude that the decision in *Blum v. 1st Auto & Casualty Insurance Co.,* 2010 WI 78, ¶ 13, 326 Wis. 2d 729, 786 N.W.2d 78, did not require the court of appeals to disregard *Middleton* in its analysis because *Anson* overruled *Middleton* only to the extent that "it held a circuit court may take additional evidence at [a *Harrison v. United States,* 392 U.S. 219 (1968)] hearing." However, *Middleton* is factually distinguishable from this case and is now completely overruled on the merits.

¶ 6. Because we determine that Stevens' Fifth Amendment privilege against self-incrimination and his equivalent right under Article I, Section 8 of the Wisconsin Constitution were not violated, we affirm the decision of the court of appeals.

## I. FACTUAL BACKGROUND

¶ 7. The law in this case is highly fact-dependent. Consequently, we set out the facts with particularity.

¶ 8. On July 22, 2008, David Stevens, a 19-year-old convicted sex offender, was involved in an incident with an eight-year-old Waukesha girl in a swimming

pool at an apartment complex in the city. The incident occurred shortly after 5:00 p.m.

¶ 9. Around 7:00 p.m., two City of Waukesha officers were dispatched separately to the girl's home. They met with the girl, her parents, and her older sister. Officers Michael Carpenter and Cory Fossum were told that the girl had been swimming in the pool when she was approached in the water by a young man who appeared to be about 17. The girl described the man as "creepy." She said the man asked to play with her. He grabbed her three or four times and ran his hands up and down the girl's sides. She did not assert that the young man had touched her private areas. The girl got out of the pool, crying, and told her older sister what had happened. The two wrote down the license plate of the man's car, which the older sister described as an orange vehicle with spray paint on it.

¶ 10. The two officers followed up their interview by going to the parking area of the apartment complex where they eventually located the car. As the officers looked for a vehicle identification number, Stevens came out of an apartment building and told them to get away from his car.

¶ 11. This exchange was the first interaction between police officers and Stevens concerning the incident. Stevens, who appeared to be wearing a swimming suit under his jeans, gave his name as David Stevens. Officer Carpenter asked him whether he had been at the pool. He admitted that he had. When asked about the girl, Stevens first denied any contact with a young girl, then told the officers that he saw a girl swimming in the deep end of the pool and grabbed her to pull her to safety because he was afraid she might not be able to swim. Challenged on this version of the facts, Stevens acknowledged rubbing his hands up and down the girl's

sides and asking her to play. He eventually admitted having gratifying sexual thoughts about the girl but said he left the pool because he realized his behavior was wrong.

¶ 12. When Stevens gave his name, Officer Fossum went to his squad car to run an identity check on his computer. He later returned to the scene to ask Stevens about a pending felony charge of failing to update his residency information with the sex offender registry. Stevens acknowledged the charge and explained why he was required to register—he had committed the offense of fondling a 5-year-old girl when he was 14.

¶ 13. Shortly thereafter, Officer Carpenter arrested Stevens, placed him in his squad car, and transported him to the Waukesha police station where he was confined in a holding cell overnight. The arrest occurred sometime before 10:00 p.m. Stevens was not questioned in the squad car or at the police station.

¶ 14. Stevens did not have a fixed residence. He indicated that he had been kicked out of his mother's house, was homeless, and was temporarily staying with friends at the apartment complex.

¶ 15. The following day, July 23, at 10:30 a.m., Stevens was interviewed by Detective Rick Haines who had been assigned to the case by Lieutenant Detective William H. Graham, Jr. Detective Haines had been a police officer for more than 25 years and was working in the sensitive crimes unit of the Waukesha Police Department. The interview was electronically recorded. Stevens received and waived his *Miranda* rights before he began to answer questions. He agreed specifically to make a voluntary statement. Detective Haines warned Stevens that he would be asking him some "pointed questions about some things you[']ve been involved in."

■■■■■■■■■■■■■■

■■■■■■■■■

In response to a question, Haines replied: "You[']re going to be charged with something, you know, but to what degree or as far as what specifically, that[']s to be determined, all right?"

¶ 16. Over the course of the interrogation, Stevens admitted having physical contact with the young girl. He admitted bumping into the girl intentionally once or twice, and wrapping his hands around her stomach.

¶ 17. Stevens then said, "I[']m starting to feel a little uncomfortable, like I want a lawyer here or something." Detective Haines inquired further whether Stevens wanted a lawyer and Stevens replied: "I think I want to talk to my lawyer." Detective Haines treated Stevens' statements as an invocation of the right to counsel and ceased the interrogation. The interrogation ended at 10:35 a.m., meaning that it had lasted about five minutes.

¶ 18. Detective Haines stepped out of the interview room briefly, then returned to escort Stevens back to the holding cell. During the short walk to the cell, Stevens indicated that he had changed his mind, that he wanted to clear the matter up and wanted to continue speaking to Haines. Detective Haines explained that he was not able to continue immediately and that, in any event, he could not resume the questioning unless Stevens waived his right to an attorney. According to Haines, Stevens replied that it was his intention once again to waive his right to an attorney. Before Detective Haines left, Stevens said: "Make sure you come back, make sure you come back because I want to talk to you." Detective Haines assured Stevens he would return. At that point, Detective Haines left to interview the complaining witness.

¶ 19. At approximately 1:00 p.m., Attorney Jenny Yuan, a public defender, came to the police department, seeking to meet with Stevens, but Lieutenant Graham denied her access. Attorney Yuan went to the police station after Stevens' mother called her at 12:07 p.m., and left a message that Stevens was in custody for an alleged sexual assault. Lieutenant Graham later testified that he believed he had called Stevens' mother that morning to let her know that Stevens was in custody, inasmuch as he had had contact with the mother before. Lieutenant Graham testified that he denied Attorney Yuan access to Stevens because "I know that [Stevens] made no request for her. So how she ended up at the police department, the request had to come through somebody else."

¶ 20. Attorney Yuan, in turn, testified later that she "was not allowed to see Mr. Stevens." She was at the station because she had been called by Stevens' mother and "was representing him . . . on pending cases" and "wanted to know if he was being questioned or if he had asked for me." Attorney Yuan was told "[t]hat [she] would have to speak with Detective Haines and that he wasn't in the department at that time." Attorney Yuan left a written message for Detective Haines at the station. She also left a voicemail for him after returning to her office.

¶ 21. Detective Haines completed his interview of the complaining witness at the C.A.R.E. Center[1] and returned to the police station. There he met with Lieutenant Graham, but neither man could recall later

---

[1] The C.A.R.E. center is a child advocacy center in Waukesha County that provides services to child abuse victims. It is a multi-agency collaboration that provides several services onsite including forensic interviews.

whether there had been any discussion of Attorney Yuan's attempt to meet with Stevens.

¶ 22. At approximately 3:00 p.m., Detective Haines went to the holding cell to ascertain whether Stevens still wished to answer questions. Stevens said that he wanted to continue. This willingness is reflected in the transcript of the second recorded interview.

> DETECTIVE HAINES: Okay, David, I brought you back up here because you indicated to me that you had a change - -

> MR. STEVENS: Uh huh [affirmative].

> DETECTIVE HAINES: - - a change of heart and that you wished to speak with me. Let it be clear that you approached me with that and I did not approach you with this?

> MR. STEVENS: Yes.

> DETECTIVE HAINES: Is that accurate?

> MR. STEVENS: That is clear.

> DETECTIVE HAINES: . . . Again, David, I am aware of the fact that our last interview ended when you invoked your Constitutional right to an attorney, and you had indicated to me that you wish to waive that right and speak to me now about this matter?

> MR. STEVENS: Yeah.

> DETECTIVE HAINES: Is that accurate?

> MR. STEVENS: I[']m afraid, but I[']m still willing to push forward because — —

> . . . .

> DETECTIVE HAINES: — — whether you[']d like to speak with me . . . . Again, I make no promises. I make

168

no threats. I make no issue. You approached me with your intention of speaking with me further and again, I would be happy to speak with you. I['|d be happy to take down any information that you have to offer, but I guess for the record, this was your idea, correct? Yes or no?

MR. STEVENS: Yes.

¶ 23. Detective Haines then went through eight questions embodying the rights against self-incrimination set out in *Miranda,* 384 U.S. at 479. Stevens waived his rights and agreed again "to make a voluntary statement."

¶ 24. Detective Haines then elicited additional information from Stevens. Stevens admitted that he had intentionally touched the victim with his "intimate parts" three or four times for the purpose of sexual gratification.

¶ 25. Detective Haines then requested that Stevens give a written statement. Stevens gave a statement to Detective Haines. Haines wrote out the statement, and Stevens reviewed it and signed it.

¶ 26. The written statement is on a form titled "Waukesha Police Department Criminal Complaint Statement Form," dated July 23, 2008, at 3:00 p.m. It lists and acknowledges constitutional rights and contains the written statement. The statement provides a few additional details about the incident including the name of the apartment complex, the victim's name and approximate age, and the desire of Stevens to get mental health treatment rather than go to jail. The form notes that the interrogation ended at 3:40 p.m.

¶ 27. The second interrogation, conducted in mid-afternoon, and the written statement signed by Stevens are at issue in this case.

## II. PROCEDURAL HISTORY

¶ 28. The State filed a criminal complaint against Stevens on July 24, 2008. It charged him with First Degree Sexual Assault—sexual contact with a child under the age of 13, contrary to Wis. Stat. § 948.02(1)(e),[2] and Felony Bail Jumping, contrary to Wis. Stat. § 946.49(1)(b). The court found probable cause for a bindover at a preliminary examination on August 7, after hearing testimony from Detective Haines.

¶ 29. On November 17, Stevens moved to suppress all statements he made to law enforcement officers. He also sought an evidentiary hearing on his motion. This led to hearings before Judge Mawdsley on April 1, April 29, and June 11, 2009, where most of the facts cited in Section I were developed.

¶ 30. Judge Mawdsley's oral findings of fact—on June 25—are consistent with the facts recited in Section I. However, Judge Mawdsley was impressed by the testimony of Lieutenant Graham: "Graham testified credibly that if in fact he had known that Mr. Stevens had invoked his right to have . . . contact with his counsel[,] then he would have definitely allowed Attorney Yuan to have contact . . . with the defendant." Judge Mawdsley added:

> I think the key case here . . . is the *Middleton* case, and the key factor here is that the second waiver of rights did not have any information communicated to the defendant . . . that his attorney had appeared and that his attorney wanted to speak to him, or just the fact that the attorney had appeared might have been sufficient.

---

[2] All subsequent references to the Wisconsin Statutes are to the 2007–08 version unless otherwise indicated.

170

So basically in my opinion the State . . . failed to prove by a preponderance of the evidence that [Stevens'] change of heart to speak to an attorney *would have continued* if he had been given that knowledge. (Emphasis added).

¶ 31. Relying heavily on *Middleton,* Judge Mawdsley determined that because information about Attorney Yuan's visit was not disclosed to Stevens before the second interview, Stevens' second waiver of his *Miranda* rights "was not a knowing waiver," thus requiring suppression of everything in the second interview. He ruled, in effect, that Stevens could not waive his *Miranda* rights without having information about the attorney's visit.

¶ 32. On August 7, 2009, the State filed a notice of appeal under Wis. Stat. § 974.05(1)(d)2., challenging the circuit court's decision to suppress some of Stevens' custodial statements. That same day, the State (via the Assistant District Attorney) moved to supplement the factual record. Together with its notice of appeal, the Department of Justice filed a motion with the court of appeals to remand the case to the circuit court to give the circuit court authority to supplement the factual record. The court of appeals granted this motion.

¶ 33. After several delays, the circuit court held a hearing on the motion to supplement the record. This motion was vigorously resisted by the defendant and denied by the court, even though the State complied with a court directive to submit an offer of proof. The offer of proof read in part:

The State of Wisconsin, by Assistant District Attorney Lloyd V. Carter, . . . filed a motion in the above case to supplement the factual record generated on April 1, 2009; April 29, 2009; and June 11, 2009. The Court

171

rendered its decision regarding the defendant's motions on June 25, 2009 at or shortly after 11:00 a.m.

On June 25, 2009, after receiving the Court's decision, Assistant District Attorney Lloyd V. Carter, along with legal intern Bryan Bayer were returning to the Waukesha County District Attorney office facilities on the ground floor of the courthouse when they were approached by a person recognized by ADA Carter as the mother of David W. Stevens (believed to be Kathryn A. Stevens . . . ). ADA Carter further recognized this individual as having been present at all of the aforementioned evidentiary hearing dates and this female subject did identify herself as the mother of defendant, David W. Stevens. Kathryn Stevens did initiate conversation with ADA Carter . . . . Kathryn Stevens went on to state that she wished she had an opportunity to provide information to the Court earlier when [Lieutenant] Detective Graham and Attorney Yuan had testified relative to the evidentiary motions that had just been decided in Branch 11. *Kathryn Stevens further went on to provide unsolicited statements that the reason she had contacted the Public Defender's office and asked Attorney Yuan to go to the City of Waukesha Police Department to see her son was because she had received a telephone call from her son who was in custody at the City of Waukesha Police Department and that her son had requested that she contact his attorney, who represented him on another matter.* Upon receiving this information, ADA Carter asked a few clarifying questions and confirmed Kathryn Stevens' position, that the defendant had called her from the City of Waukesha jail and asked her to contact Attorney Yuan to come see him.

ADA Carter believed this factual assertion by Kathryn Stevens to be both material and relevant to the Court's decision rendered earlier that date, which decision was made without the benefit of this additional factual information.

(Emphasis added.)

¶ 34. Neither Stevens' counsel nor the circuit court wanted any part of supplementing the record with new evidence. On November 11, 2009, the court issued a final order: "The Court finds that the testimony shall not be re-opened. The offer of proof fails to provide facts which would change the court's original decision." Consequently, there is *no evidence in the record* that Stevens ever called his mother and asked her to contact the attorney who represented him in another matter. The defendant's counsel strongly opposed the introduction of evidence to support this proposition, and the State refused to stipulate to it. Thus, such evidence was not considered by the court of appeals, *Stevens,* No. 2009AP2057–CR, unpublished slip op., ¶ 16 n.4, and will not be considered by this court.

¶ 35. As noted, in an unpublished opinion, the court of appeals reversed the circuit court's decision to suppress evidence, and it remanded the case for trial. *Id.,* ¶ 1. The court of appeals concluded that the circuit court's determination that Stevens initiated contact with his interrogator was not erroneous. *Id.,* ¶ 13. It ruled that Stevens' lack of knowledge regarding whether the attorney had visited the police station did not affect whether his waiver was knowing. *Id.,* ¶ 15. In the end, the court of appeals held that the suppression order was reversed "[b]ecause Stevens initiated contact with the police and knowingly, intelligently and voluntarily waived his Fifth Amendment right to counsel." *Id.,* ¶ 18.

### III. STANDARD OF REVIEW

█

¶ 36. When we review a decision to suppress statements made to police, we accept the "circuit court's findings of historical fact unless they are clearly erro-

neous."[3] *State v. Ward,* 2009 WI 60, ¶ 17, 318 Wis. 2d 301, 767 N.W.2d 236. We review de novo the application of constitutional principles to those facts. *Id.*

## IV. ANALYSIS

¶ 37. The Fifth Amendment to the United States Constitution reads in part that: "No person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V.

¶ 38. This element of the amendment has been incorporated into the Fourteenth Amendment to apply to the States. *Malloy v. Hogan,* 378 U.S. 1, 6 (1964).

¶ 39. Article I, Section 8 of the Wisconsin Constitution contains a parallel provision: "No person . . . may be compelled in any criminal case to be a witness against himself or herself." Wis. Const. art. I, § 8.

¶ 40. This court has normally construed the right against self-incrimination in Article I, Section 8 of the Wisconsin Constitution to be consistent with the United States Supreme Court's interpretation of the federal right. *State v. Jennings,* 2002 WI 44, ¶¶ 37–42, 252 Wis. 2d 228, 647 N.W.2d 142 (citing cases).

A. The Right to Counsel Under *Miranda v. Arizona*

¶ 41. In *Miranda v. Arizona,* the Supreme Court dealt with the question of what

restraints society must observe consistent with the Federal Constitution in prosecuting individuals for crime. . . . [And] with the admissibility of statements obtained from an individual who is subjected to custo-

[3] The circuit court's findings of fact were not clearly erroneous; thus we are bound by them.

> dial police interrogation and the necessity for procedures which assure that the individual is accorded his privilege under the Fifth Amendment to the Constitution not to be compelled to incriminate himself.

*Miranda,* 384 U.S. at 439.

¶ 42. The *Miranda* Court focused on pre-charge custodial interrogation[4] which the Court had held, two years earlier, is a critical stage in criminal proceedings. *Escobedo v. Illinois,* 378 U.S. 478, 486 (1964).[5] The Court described the nature and setting of custodial interrogation at length, stressing "the inherent pressures of the interrogation atmosphere," *Miranda,* 384 U.S. at 468, including psychological coercion. *Id.* at 445–56.

> We have concluded that without proper safeguards the process of in-custody interrogation of persons suspected or accused of crime contains inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely. In order to combat these pressures and to permit a full opportunity to exercise the privilege against self-incrimination, the accused must be adequately and effectively apprised of his rights and the exercise of those rights must be fully honored.

*Id.* at 467.

---

[4] The Court in *Miranda v. Arizona,* 384 U.S. 436 (1966), defined custodial interrogation as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Id.* at 444.

[5] *Moran v. Burbine,* 475 U.S. 412, 430 (1986), clarified the constitutional source of the rights described in *Miranda,* disavowing a Sixth Amendment basis for those rights. Pre-charge custodial interrogation is undoubtedly an important point in criminal procedure but because it precedes the filing of a criminal charge, it does not trigger a Sixth Amendment right to counsel.

> Our aim is to assure that the individual's right to choose between silence and speech remains unfettered throughout the interrogation process.

*Id.* at 469.

¶ 43. To ensure that the Fifth Amendment privilege against self-incrimination is not lost in these circumstances, the Court declared that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." *Id.* at 444.

¶ 44. The Court said that police are free to use any "fully effective means . . . to inform accused persons of their right of silence and to assure a continuous opportunity to exercise it," *id.*, but the Court prescribed a constitutionally sufficient method to protect that right and others—the now well-known *Miranda* warning: "Prior to any questioning [of a person in custody], the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." *Id.*

¶ 45. The Court restated and amplified its holding later in the opinion:

> To summarize, we hold that when an individual is taken into custody or otherwise deprived of his freedom by the authorities in any significant way and is subjected to questioning, the privilege against self-incrimination is jeopardized. Procedural safeguards must be employed to protect the privilege, and unless

other fully effective means are adopted to notify the person of his right of silence and to assure that the exercise of the right will be scrupulously honored, the following measures are required. *He must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.* Opportunity to exercise these rights must be afforded to him throughout the interrogation. *After such warnings have been given, and such opportunity afforded him, the individual may knowingly and intelligently waive these rights and agree to answer questions or make a statement.* But unless and until such warnings and waiver are demonstrated by the prosecution at trial, no evidence obtained as a result of interrogation can be used against him.

*Id.* at 478–79 (emphasis added).[6]

██

¶ 46. The precise Constitutional status of the *Miranda* warning remains somewhat unsettled. *Compare New York v. Quarles,* 467 U.S. 649, 654 (1984), *with Dickerson v. United States,* 530 U.S. 428, 432 (2000). But the purpose of a *Miranda* warning is not in question: It is to ensure that a suspect's privilege against self-incrimination when in custody is protected, so that if the suspect chooses to speak and makes an incriminating statement, the statement will be know-

---

[6] The Court was careful to limit the "burdens" of its holding so that it would "not constitute an undue interference with a proper system of law enforcement." *Miranda,* 384 U.S. at 481. The Court specifically noted that the decision "does not mean, as some have suggested, that each police station must have a 'station house lawyer' present at all times to advise prisoners." *Id.* at 474.

ing, intelligent, and voluntary. The suspect must understand that he has the right to remain silent.

¶ 47. The majority opinion in *Miranda* is more than 60 pages long. It represents a compelling statement of constitutional principles to protect defendants from official overreaching in criminal cases. It also contains enduring guidelines of the procedures that law enforcement officers are expected to follow in conducting custodial interrogations. At the same time, the *Miranda* decision is filled with ambiguities and internal conflicts. Like other landmark decisions, *Miranda* could not anticipate, and does not provide answers for, every possible fact situation. The present case is like a law school exam question that tests conflicting principles and challenges the court to synthesize and reconcile the decisions in a number of key Supreme Court and Wisconsin Supreme Court cases that have interpreted *Miranda* over the past four decades.

■■

¶ 48. Among the most important conclusions in *Miranda* is that once an individual invokes the right to counsel, interrogation must cease. *Id.* at 444–45. "If [a suspect] indicates in any manner and at any stage of the process that he wishes to consult with an attorney before speaking there can be no questioning." *Id.* "Once warnings have been given, the subsequent procedure is clear. If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease." *Id.* at 473–74.

¶ 49. This rule was firmed up in *Edwards v. Arizona,* 451 U.S. 477 (1981).[7] Robert Edwards was

---

[7] *Edwards v. Arizona* was decided under the Fifth and Fourteenth Amendments with respect to counsel, self-

charged with three felonies, including first-degree murder. In custody he promptly asserted his right to counsel and his right to remain silent. Nonetheless, the police, without furnishing him an attorney, returned the following day to confront Edwards and secure an incriminating statement from him. The *Edwards* Court determined that once an accused invokes his right to counsel under *Miranda, the police must cease interrogation until counsel is present* unless the accused himself initiates further communication with the police. *Id.* at 484–85.

¶ 50. Post-*Miranda* cases have frequently presented questions about whether an accused has, in fact, invoked his right to counsel after receiving a *Miranda* warning and, if he has, whether law enforcement has faithfully honored that right. These issues are not presented in this case because Stevens clearly invoked his right to counsel and Detective Haines honored that right.

■

¶ 51. Instead, this case poses the question whether Detective Haines was entitled to approach Stevens and ask for permission to resume interrogation in light of intervening events. *Edwards* explained that once an accused has expressed "his desire to deal with the police only through counsel, [he] is not subject to further interrogation by the authorities until counsel has been made available to him, *unless the accused himself initiates further communication, exchanges, or conversations with the police.*" *Id.* (emphasis added).

¶ 52. The *Edwards* Court did *not* adopt the assertion in Justice Powell's concurring opinion that "police

incrimination, and custodial interrogation, 451 U.S. 477, 478–80 (1981), even though the case involved interrogation after a criminal complaint had been filed.

legitimately may inquire whether a suspect has changed his mind about speaking to them without an attorney." *Edwards*, 451 U.S. at 490 (Powell, J., concurring). On the contrary, police may not "inquire" until the accused himself has initiated further communication with them, opening the door to further discussion.[8] When the accused initiates communication with police, the paradigm is reset and police may explore whether the accused is willing to answer questions. They may proceed with custodial interrogation if the accused again is given a *Miranda* warning and again waives his *Miranda* rights. *See Oregon v. Bradshaw,* 462 U.S. 1039, 1044 (1983) (plurality opinion).[9]

¶ 53.　The *Edwards* rule has been described as a prophylactic "bright-line rule to safeguard" the right against self-incrimination. Once the right to counsel

---

[8] "The *Edwards* rule is 'designed to prevent police from badgering a defendant into waiving his previously asserted *Miranda* rights.'" *Montejo v. Louisiana,* 556 U.S. 778, 129 S. Ct. 2079, 2085 (2009) (quoting *Michigan v. Harvey,* 494 U.S. 344, 350 (1990)).

[9] The plurality opinion in *Oregon v. Bradshaw,* 462 U.S. 1039 (1983), explains that the initiation of conversation by an accused does not amount to a waiver of the previously invoked right to counsel in the sense that police may begin or resume questioning without administering a new *Miranda* warning or otherwise being prepared to show that any statements offered by the accused are knowing, intelligent, and voluntary. *Id.* at 1044–46.

The concurrence/dissent seeks to transform *Bradshaw* into a rule that an accused's invocation of the Fifth Amendment right to counsel remains completely intact, no matter what the accused says to withdraw or cancel that invocation, until he is given and waives a second *Miranda* warning. Chief Justice Abrahamson's concurrence/dissent, ¶¶ 112, 123. This is not what *Bradshaw* holds or implies.

has been invoked, a waiver of that right is acceptable if and only if the suspect initiates communication with police. *Solem v. Stumes,* 465 U.S. 638, 644, 646 (1984).[10]

¶ 54. Here, there is no question that Stevens initiated conversation with Detective Haines. Detective Haines carefully documented that initiation and also informed Stevens of the *Miranda* safeguards a second time and obtained a new waiver. There appears to be no dispute that these procedures would be unassailable if Detective Haines had sought to resume interrogation immediately.

¶ 55. Stevens asserts, however, that Detective Haines could not resume questioning, even with an explicit waiver from Stevens, because Stevens was not informed and did not know that his attorney in a different case had attempted to see him. He cites *Middleton* to support this contention. Stevens contends that Waukesha police had a constitutional duty to give the attorney access to Stevens or at least inform Stevens that the attorney was trying to see him. Stevens argues that without the benefit of conferring with counsel or being informed that counsel had attempted to see him, he could not make a knowing, intelligent, and voluntary waiver, and police had no right to approach him to ask for one.

¶ 56. This argument requires the court to examine additional cases. The Supreme Court has held that defendants can waive the Sixth Amendment right to counsel, even if already represented, without speaking to counsel about the waiver. *Michigan v. Harvey,* 494

---

[10] In *State v. Hambly,* 2008 WI 10, 307 Wis. 2d 98, 745 N.W.2d 48, the court discussed what constitutes sufficient initiation by an accused individual to permit further interrogation. *Id.,* ¶¶ 67–90. The sufficiency of the initiation in this case is not before us.

U.S. 344, 353 (1990); *see also Montejo v. Louisiana,* 556 U.S. 778, 129 S. Ct. 2079, 2085 (2009) ("The defendant may waive the right whether or not he is already represented by counsel; the decision to waive need not itself be counseled."). If a person can waive his Sixth Amendment right to counsel without speaking to counsel about the waiver, an individual should be able to waive his Fifth Amendment right inasmuch as the individual—who is still uncharged—normally does not yet have counsel.

¶ 57. Here, Stevens was not represented by counsel on either of the *new* charges because he had not yet been charged. Attorney Yuan had not yet been appointed on new charges.

¶ 58. Thus, the critical issue is whether Stevens' invocation of the right to counsel at 10:35 a.m. on July 23 somehow survived his almost immediate initiation of conversation with his interrogator in which he emphatically asked to resume the questioning and expressed his willingness to withdraw his request to speak with his attorney by waiving his *Miranda* rights. It should be noted that Stevens' initiation occurred before his attorney in the prior case appeared at the police station and before she even learned that Stevens was in custody. Did Stevens' invocation at 10:35 a.m. require that Attorney Yuan be given access to him at 1:00 p.m., notwithstanding Stevens' initiation of conversation with Detective Haines shortly after 10:35 a.m.?

¶ 59. The Supreme Court's decision in *Moran v. Burbine,* 475 U.S. 412 (1986) is helpful. It addressed a situation in which an attorney attempted to see a person in custody—before the person was charged—and was not only denied access but also misled by police. The issue in *Burbine* was "whether a prearraignment confession preceded by an otherwise valid waiver

must be suppressed . . . because [police] failed to inform the suspect of [an] attorney's efforts to reach him." *Burbine,* 475 U.S. at 420. The Court held that the statement need not be suppressed. *Id.*

¶ 60. In *Burbine,* Cranston, Rhode Island, police arrested a man in connection with a burglary and sought to question him about an unrelated murder. *Id.* at 416. That evening, the accused's sister contacted the Public Defender's Office, and an Assistant Public Defender followed up by contacting police and notifying them that she would serve as the accused's counsel during any lineup or questioning. *Id.* at 416–17. Police assured the attorney that they would not question the accused until the next day. *Id.* at 417. The accused was unaware that his sister had contacted an attorney and unaware that an attorney had contacted police on his behalf. *Id.* Later that day, the accused waived his *Miranda* rights and admitted to the murder. *Id.* at 417–18.

¶ 61. The Court held that the incriminating statement did not need to be suppressed. *Id.* at 420. The Court noted that the accused's waiver of his rights was voluntary. *Id.* at 421–22. The Court stated:

> Events occurring outside of the presence of the suspect and entirely unknown to him surely can have no bearing on the capacity to comprehend and knowingly relinquish a constitutional right. . . . No doubt the additional information would have been useful to respondent; perhaps even it might have affected his decision to confess. But we have never read the Constitution to require that the police supply a suspect with a flow of information to help him calibrate his self-interest in deciding whether to speak or stand by his rights.

*Id.* at 422.

183

¶ 62. In explaining its decision, the Court went on further to say:

> Nor do we believe that the level of the police's culpability in failing to inform respondent of the telephone call has any bearing on the validity of the waivers. In light of the state-court findings that there was no "conspiracy or collusion" on the part of the police, we have serious doubts about whether the [First Circuit] Court of Appeals was free to conclude that their conduct constituted "deliberate or reckless irresponsibility." But whether intentional or inadvertent, the state of mind of the police is irrelevant to the question of the intelligence and voluntariness of respondent's election to abandon his rights. Although highly inappropriate, even deliberate deception of an attorney could not possibly affect a suspect's decision to waive his *Miranda* rights unless he were at least aware of the incident. *Compare Escobedo v. Illinois,* 378 U.S. 478, 481 (1964) (excluding confession where police incorrectly told the *suspect* that his lawyer " 'didn't want to see' him"). Nor was the failure to inform respondent of the telephone call the kind of "trick[ery]" that can vitiate the validity of a waiver. *Miranda,* 384 U.S. at 476. Granting that the "deliberate or reckless" withholding of information is objectionable as a matter of ethics, such conduct is only relevant to the constitutional validity of a waiver if it deprives a defendant of knowledge essential to his ability to understand the nature of his rights and the consequences of abandoning them.

*Id.* at 423–24 (citations omitted).

¶ 63. The Court in *Burbine* "decline[d] the invitation to further extend *Miranda*'s reach" to require "the reversal of a conviction if the police are less than forthright in their dealings with an attorney or if they fail to tell a suspect of a lawyer's unilateral efforts to contact him." *Id.* at 424. Such a rule would "ignore[] the

184

underlying purposes of the *Miranda* rules." *Id.* The Court also expressed concern about the ripple effect such a rule would have and the myriad questions such a rule would raise. *Id.* at 425. Thus, "[b]ecause neither the letter nor purposes of *Miranda* require[d]" it, the Court was "unwilling to expand the *Miranda* rules to require the police to keep the suspect abreast of the status of his legal representation." *Id.* at 427.

¶ 64. In the course of its decision, the *Burbine* Court stated that "the privilege against compulsory self-incrimination is . . . a personal one that can only be invoked by the individual whose testimony is being compelled." *Id.* at 433 n.4. In other words, in pre-charge circumstances, a third-party such as an attorney, a family member, or a friend may not invoke, on behalf of the suspect, the suspect's constitutional right to request the presence of an attorney. Only the suspect may invoke that right.

¶ 65. The *Burbine* analysis was affirmed in *State v. Hanson,* 136 Wis. 2d 195, 401 N.W.2d 771 (1987), and *Ward,* 318 Wis. 2d 301. The *Hanson* case specifically rejected an appeal that the court interpret Article I, Section 8(1) of the Wisconsin Constitution to require law enforcement authorities to inform a suspect that there is an attorney available and asking to see him. The Court said:

> Hanson requests that this court hold that law enforcement personnel violated his rights under Article I, sec. 8(1) of the Wisconsin Constitution by questioning Hanson without his "appointed" counsel's consent or presence and failing to inform Hanson that counsel was trying to see him.
>
> . . . .
>
> We do not believe that the suspect's knowledge of

185

the location of a particular counsel can affect the intelligent waiver of his constitutional rights as described in *Miranda* warnings. Since the knowledge of the location of counsel adds no constitutional rights, does not alter the facts of the case as the suspect knows them, and does not give rise to any coercive influence by the police, such knowledge is not relevant to the suspect's voluntary decision to waive his rights. Although a suspect who was ready to waive his rights might change his mind when told an attorney was waiting to see him, the critical factor would be the convenience of seeing the attorney, not the intelligent perceived need for legal counsel. Since the convenience of the defendant is not constitutionally protected, the location of a particular attorney is not constitutionally required information.[11]

*Hanson,* 136 Wis. 2d at 207–08, 211–12.

¶ 66. There are compelling reasons why an attorney under the Fifth Amendment is different from an attorney under the Sixth Amendment. The Sixth Amendment right to counsel is grounded in the text of the amendment. It attaches "only at or after the initiation of adversary judicial proceedings against the defendant." *United States v. Gouveia,* 467 U.S. 180, 187 (1984). "[O]nce the adversary judicial process has been initiated, the Sixth Amendment guarantees a defendant the right to have counsel present at all 'critical' stages of the criminal proceedings." *Montejo,* 129 S. Ct. at 2085 (citing *United States v. Wade,* 388 U.S. 218, 227–28

---

[11] The *Hanson* court also stated: "We agree with the United States Supreme Court that an event occurring outside the presence of the defendant and entirely unknown to him can have no bearing on his capacity to comprehend and knowingly relinquish a constitutional right." *State v. Hanson,* 136 Wis. 2d 195, 217, 401 N.W.2d 771 (1987).

(1967); *Powell v. Alabama,* 287 U.S. 45, 57 (1932)). Once the right has attached, the police may not interfere with the efforts of a defendant's attorney to act as a "medium" between the suspect and the State during interrogation. *Burbine,* 475 U.S. at 428 (citing *Maine v. Moulton,* 474 U.S. 159, 176 (1985)).

¶ 67. The Fifth Amendment does not address the right to counsel in its text. Rather, the Fifth Amendment establishes a person's right not to "be compelled in any criminal case to be a witness against himself." While a suspect's right to remain silent undoubtedly applies to pre-charge custodial interrogation, the suspect's right to counsel before a charge is filed is derivative of the Fifth Amendment right to remain silent. It serves as a prophylactic to shore up the privilege against self-incrimination. The Court in *Miranda* said that "the need for counsel *to protect the Fifth Amendment privilege* comprehends not merely a right to consult with counsel prior to questioning, but also to have counsel present during any questioning *if the defendant so desires." Miranda,* 384 U.S. at 470 (emphasis added).

¶ 68. In short, a suspect in custody may remain silent by *declining* to answer questions, by *asserting* his right to remain silent, or by *invoking* his right to an attorney to help him remain silent. But the suspect *must* invoke the right to counsel to assure that interrogation is not only terminated but also may not be resumed *except* at the personal initiation of the suspect. If a suspect wishes to be placed on the constitutional equivalent of a "do not call" list, he must invoke the right to counsel so that the police may not approach him to ask questions. If interrogation is terminated

187

because a defendant has invoked the right to counsel, the actual *need* for counsel is substantially eliminated, and thus counsel may not be appointed until the defendant appears in court. There is no need to suppress a defendant's statements if the police have not asked him questions.

¶ 69. In *Hanson,* this court held that the Wisconsin Constitution provides no further protections beyond *Burbine* that would require police to tell suspects of an attorney's availability to see them. *Hanson,* 136 Wis. 2d at 208–12. The court stated:

> If this information were required, distinctions between suspects would unfairly develop depending on whether third persons were able to engage the services of an attorney. A new area of law would develop regarding actions of police in particular fact situations, *i.e.,* was the attorney in the building, was the attorney on the telephone, was the attorney on his way to the building, was the attorney not immediately available but would be by a definite time, would a substitute attorney satisfy the requirement. Another line of cases could develop around who requested such representation: the accused's family, friends, or perhaps a criminal accomplice, or the attorney himself who has a reduced caseload.

*Id.* at 212.

¶ 70. This brings us back to the present case. This case is distinguishable from *Burbine, Hanson,* and *Ward* on the simple fact that at 10:35 a.m. Stevens invoked the right to counsel. If nothing else had happened, Detective Haines would *not* have been able to approach Stevens again, would *not* have been able to ask him whether he was willing to talk, and would *not* have been able to administer a new *Miranda* warning. This follows the rule in *Edwards. See also Arizona v.*

*Roberson,* 486 U.S. 675 (1988); *Minnick v. Mississippi,* 498 U.S. 146, 153 (1990) ("[W]e now hold that when counsel is requested, interrogation must cease, and officials may not reinitiate interrogation without counsel present, whether or not the accused has consulted with his attorney.").

¶ 71. But something else happened. First, after Detective Haines terminated the interrogation, Stevens spontaneously initiated conversation with his interrogator and asked to continue the questioning—to clear the matter up. When Detective Haines explained that he was not able to continue immediately and that he could not resume the questioning unless Stevens waived his right to an attorney, Stevens replied that it was his intention to waive his rights again. He said to Detective Haines, as the detective was leaving: "Make sure you come back, make sure you come back because I want to talk to you." Detective Haines assured Stevens that he would return.

¶ 72. Second, there is no evidence in the record that Stevens changed his mind during the four plus hours between the time when Detective Haines left and the time he returned. There is no evidence that he made any effort to secure counsel while Detective Haines was absent. On the contrary, Lieutenant Graham testified that "I know that [Stevens] made no request" for Attorney Yuan.

¶ 73. Finally, Stevens affirmed his desire to continue talking; and after receiving his *Miranda* warning a second time, he waived his rights. This encounter was recorded and the recording has been transcribed.

¶ 74. Thus, Stevens withdrew his request for counsel. He cancelled his invocation of the right to counsel by initiating a dialogue in which he asked to continue the interrogation. This cancellation was con-

firmed by the fact that Stevens made no effort to secure counsel while his interrogator was absent, by repeating his desire to continue discussion, and by waiving the right to counsel after receiving a second *Miranda* warning.

¶ 75. In *Minnick v. Mississippi,* 498 U.S. at 156, the Court explained that "*Edwards* does not foreclose finding a waiver of Fifth Amendment protections after counsel has been requested, *provided the accused has initiated the conversation or discussions with the authorities.*" (Emphasis added.) This case represents a textbook example of that exception.

¶ 76. In *Miranda,* the Court observed that "Interrogation still takes place in privacy. Privacy results in secrecy and this in turn results in a gap in our knowledge as to what in fact goes on in the interrogation rooms." *Miranda,* 384 U.S. at 448. Here, however, all interrogation was recorded. More important for our purposes is the fact that Stevens' initiation of conversation is confirmed in a recording along with his second waiver of *Miranda* rights. The evidence of what went on in the interrogation room is not secret.

¶ 77. Consequently, we conclude that Stevens' Fifth Amendment privilege against self-incrimination and his equivalent right under Article I, Section 8 of the Wisconsin Constitution were not violated and that Stevens' oral and written statements should not be suppressed.

## B. *Blum* and *Middleton*

¶ 78. This case presents a collateral issue that requires comment: Whether the court of appeals was correct in disregarding *Middleton* in its analysis, on grounds that *Middleton* was overruled by *Anson,* 282 Wis. 2d 629, ¶¶ 13, 31.

¶ 79. In its unpublished per curiam opinion in this case, the court of appeals observed in a footnote that:

> Our forthcoming analysis spends no time on *State v. Middleton,* 135 Wis. 2d 297, 399 N.W.2d 917 (Ct. App. 1986), because that case was overruled in *State v. Anson,* 2005 WI 96, ¶ 13, 282 Wis. 2d 629, 698 N.W.2d 776. Our supreme court made clear in *Blum v. 1st Auto & Cas. Ins. Co.,* 2010 WI 78, ¶ 56, 326 Wis. 2d 729, 786 N.W.2d 78, that a[n] overruled decision of this court has no precedential value whatsoever. Therefore, *Middleton* is out of the mix.

*Stevens,* No. 2009AP2057–CR, unpublished slip op., ¶ 11 n.3.

¶ 80. This court's decision in *Blum* in 2010 provided a standard that the court of appeals and this court could apply in evaluating the precedential value of a prior court of appeals decision that this court subsequently overruled. In two places in the opinion, the court concluded that "[a] court of appeals decision loses all precedential value when it is overruled by this court." *Blum,* 326 Wis. 2d 729, ¶¶ 3, 57. The court now reaffirms this principle as a general rule. Hence, if this court overrules a court of appeals decision without further comment, the court of appeals decision has no precedential value. The policy reasons for this rule are explained in *Blum. Id.,* ¶¶ 46–56.

¶ 81. Part of our reason for a bright-line rule was to "eliminate the confusion that has surrounded" the question of what remains precedent, *id.,* ¶ 53, and to spare courts the burden of trying to figure out "precisely which holdings in court of appeals decisions are still good law." *Id.,* ¶ 54.

¶ 82. It must be acknowledged, however, that our *Blum* decision did not eliminate all "confusion" because of the fact that four times we used a qualifying "unless" clause in the discussion, namely, "unless this court expressly states otherwise," *id.,* ¶ 42, "Unless this court explicitly states otherwise," *id.,* ¶ 46, "unless it expressly states otherwise," *id.,* ¶ 54, and "unless this court expressly states that it is leaving portions of the court of appeals decision intact," *id.,* ¶ 56.

¶ 83. These "unless" clauses provided direction to *this* court to state its intent as clearly as possible if it wishes to overrule only part of a decision. However, we have come to realize that applying these "unless" clauses to past cases in which this court failed to overrule a decision without qualification is not always easy and may require interpretation if there is any serious doubt about this court's intent.

¶ 84. *Anson*'s overruling of *Middleton* illustrates the point. *Middleton* was a lengthy decision. It contained an extensive discussion of whether defendant Middleton had invoked the right to counsel after his arrest by calling his wife and asking her to contact "Gregory Hunsader" who happened to be a local attorney. *Middleton,* 135 Wis. 2d at 304. A sheriff's deputy overheard this call but did not share what he had heard with the officers interrogating Middleton. Attorney Hunsader later showed up at the jail but was denied access to Middleton, and Middleton was not told of the attorney's presence before he made some of his admissions to officers. *Middleton never explicitly invoked the right to counsel.* The court of appeals agreed, *id.* at 310, but it concluded that some of Middleton's statements (after the attorney came to the jail) had to be suppressed because of the failure of officers to advise him "that the specific attorney he had directed his wife to

contact had arrived." *Id.* at 313. However, Middleton's other statements, *if* made before the attorney's arrival, might stand.

¶ 85. A second section of the opinion—plainly delineated as a different section—dealt with the fact that Middleton testified at trial after the incriminating statements had been admitted. Was this testimony "impelled" by the state's use of tainted evidence? *Id.* at 317. If so, was Middleton's "impelled" testimony harmless error? The court of appeals determined that the trial court could hold an evidentiary hearing on remand to determine whether Middleton's testimony was "impelled by those admissions" under *Harrison v. United States,* 392 U.S. 219 (1968). *Middleton,* 135 Wis. 2d at 323.

¶ 86. In *Anson,* this court ruled "that a *Harrison* hearing is not an evidentiary hearing and overrule[d] the court of appeals' decision in *Middleton to the extent it held a circuit court may take additional evidence at such a hearing.* We hold that a *Harrison* hearing is a paper review during which a circuit court makes findings of historical fact based on the record." *Anson,* 282 Wis. 2d 629, ¶ 13 (emphasis added). "[W]e overrule the court of appeals' decision in *Middleton, to the extent it holds that the circuit court may conduct a full evidentiary hearing when engaging in a Harrison analysis."* *Id.,* ¶ 31 (emphasis added); *see also id.,* ¶ 57.

¶ 87. Looking at the narrow language of the *Anson* decision as applied in the broad context of the *Middleton* case, we conclude that the *Anson* court did not overrule the entire *Middleton* decision, and we believe it would be unreasonable to hold that it did. The court clearly identified the portion of the *Middleton* opinion that it found objectionable, and it overruled *Middleton* to that extent. The language used appears to

leave the rest of *Middleton* unaffected. Therefore, we must conclude that the court of appeals was not correct in disregarding *Middleton* on grounds that, because of *Anson, Middleton* had *"no precedential value whatsoever."*

¶ 88. On the other hand, the court of appeals was correct on the merits in not relying on *Middleton*. First, the *Middleton* court ruled that the defendant did *not* invoke the right to counsel. *Middleton,* 135 Wis. 2d at 310. Here, Stevens *did* invoke the right to counsel but then cancelled the invocation. Second, the *Middleton* court said that notwithstanding the fact that the defendant did not invoke his *Miranda* rights, he did initiate "the events which led to a specific attorney's coming to the jail." *Id.* at 312. Not so, Stevens. Attorney Yuan came to the jail as the result of a call from Stevens' mother, not a call directly or even indirectly from Stevens. Third, in *Middleton,* a deputy heard Middleton make a call and his knowledge was attributed to all other officers. If knowledge of Stevens' invocation at 10:35 a.m. should have been attributed to all other officers in the Waukesha department, so also should his cancellation of the invocation moments later.

¶ 89. The two cases are very different on their facts, so that *Middleton* would not influence the decision in *Stevens*. Moreover, the *Middleton* decision was effectively repudiated by United States District Judge Barbara Crabb in an unpublished opinion involving Middleton in 1992, *Middleton v. Murphy,* No. 91–C–0751–C, unpublished op. (W.D. Wis. Jan. 28, 1992). The Seventh Circuit agreed with Judge Crabb, attaching her full opinion to its brief opinion in 1993, *Middleton v. Murphy,* No. 91–C–0751–C, unpublished op. 996 F.2d 1219 (7th Cir. June 21, 1993). We include Judge Crabb's opinion as an appendix to this decision.

194

¶ 90. Because we agree with Judge Crabb's conclusion that Douglas Middleton's confessions were voluntary and that *Burbine* was incorrectly applied in Middleton's case, we overrule *State v. Middleton* in its entirety.

██

¶ 91. In 2010, after a great deal of internal discussion, the *Blum* court made a determination that overruled court of appeals decisions should have no *precedential* value unless this court expressly states that it is leaving portions of the court of appeals decision intact. We realize now that it is much easier to apply this rule prospectively than it is to apply it retroactively.[12] We think the *Blum* rule should be applied retroactively but with the following caveat.

---

[12] For example, how might a strict application of the *Blum* rule apply to a past decision of this court that overruled two court of appeals cases, but did so utilizing different language without the guidance of *Blum?* *E.g., Colby v. Columbia Cnty.*, 202 Wis. 2d 342, 363 & n.11, 550 N.W.2d 124 (1996) ("Because the court of appeals in *Fox[ v. Smith*, 159 Wis. 2d 581, 464 N.W.2d 845 (Ct. App. 1990)] failed to follow the precedent established by this court in *Maynard* and its progeny, we hold that the *Fox* decision *is overruled.*") ("We similarly *overrule that portion* of *Schwetz[ v. Employers Ins. of Wausau,*] 126 Wis. 2d [32,] 37 n.4, 374 N.W.2d 241 [(Ct. App. 1985)], *which is in conflict with the remainder of our holding* in the present case.") (emphasis added).

A different problem would be presented by a case that used very broad language in overruling court of appeals decisions. *E.g., State v. Walstad,* 119 Wis. 2d 483, 486, 351 N.W.2d 469 (1984):

> In so doing *we specifically overrule and repudiate the entire line of cases* stemming from *State v. Booth,* 98 Wis. 2d 20, 295 N.W.2d 194 (Ct. App. 1980), which hold that the destruction of the breathalyzer test ampoule warrants the suppression of the test results and which rely on the theory that a used ampoule is testable to

¶ 92. The "overruled unless" test cannot be applied retroactively with the same rigor that it can be applied prospectively because, before the *Blum* decision, this court did not have any agreed upon language to partially overrule a court of appeals decision, except an announcement that the court is "withdrawing" language from a decision. Thus, as noted above, courts may have to interpret cases from this court *that were decided prior to Blum* to determine whether an opinion "overruling" a court of appeals decision really intended to overrule the entire decision or only a portion of it.

¶ 93. In cases prior to *Blum,* if this court did not use any qualifying language in overruling a court of appeals decision, it probably intended to overrule the decision in its entirety, as *Blum* holds. However, if this court utilized qualifying language, it probably intended something less than a total overruling and the surviving portion of the partially overruled decision may be cited as precedent.

¶ 94. It is to be hoped that the *Blum* issues we discuss here will not surface very often.

## V. CONCLUSION

¶ 95. We conclude that David Stevens withdrew his request for an attorney by voluntarily initiating a request to resume the questioning. He knowingly, intelligently, and voluntarily provided an incriminating statement to his interrogator after he was given a second *Miranda* warning. Although Stevens validly invoked his right to counsel, he cancelled his invocation of that right by initiating a dialogue in which he asked

---

determine blood alcohol and can supply material evidence in respect to a defendant's guilt or innocence.

*Id.* (emphasis added.)

to continue the interrogation. This cancellation of the request for counsel was confirmed by the fact that Stevens made no effort to secure counsel while his interrogator was absent, by his recorded agreement that he initiated the conversation asking to resume questioning, and by his waiver of the right to counsel after receiving a second *Miranda* warning.

¶ 96. We also conclude that the decision in *Blum v. 1st Auto & Casualty Insurance Co.,* did not require the court of appeals to disregard *Middleton* in its analysis because *Anson* overruled *Middleton* only to the extent that "it held a circuit court may take additional evidence at [a *Harrison v. United States*] hearing." However, *Middleton* is factually distinguishable from this case and is now completely overruled on the merits.

¶ 97. Because we determine that Stevens' Fifth Amendment privilege against self-incrimination and his equivalent right under Article I, Section 8 of the Wisconsin Constitution were not violated, we affirm the decision of the court of appeals.

*By the Court.*—The decision of the court of appeals is affirmed.