COURT OF APPEALS
DECISION
DATED AND FILED

August 31, 2021

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2019AP1533-CR**

Cir. Ct. No. **2016CF3976**

STATE OF WISCONSIN

**IN COURT OF APPEALS
DISTRICT I**

STATE OF WISCONSIN,

PLAINTIFF-RESPONDENT,

V.

JEFFREY WILLIAM KOEPSEL, JR.,

DEFENDANT-APPELLANT.

APPEAL from a judgment of the circuit court for Milwaukee County: MARK A. SANDERS, Judge. *Affirmed*.

Before Brash, C.J., Dugan and White, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1 PER CURIAM. Jeffrey William Koepsel, Jr., appeals from a judgment, entered on a jury's verdicts, convicting him of one count of first-degree

reckless injury with use of a dangerous weapon as a party to a crime, one count of substantial battery with use of a dangerous weapon as party to a crime, and one count of fourth-degree sexual assault. Koepsel contends that the trial court erred when it denied his motions to suppress a custodial statement to police and an out-of-court identification of him. We conclude that the trial court properly denied the suppression motions, so we affirm the judgment.

## BACKGROUND

¶2      According to the criminal complaint, Sandra[1] owed money to drug dealer Travis Dickerson. Sometime between August 1, 2016, and August 3, 2016, Dickerson, Koepsel, and Nico Guerra went to Sandra's house. Dickerson began yelling at her about the money. He told Koepsel and Guerra to take her to the basement and "do what you gotta do." Koepsel and Guerra took Sandra downstairs and began beating her with an aluminum bat and a two-by-four. When the men finished, they went upstairs; Sandra was unable to move. A short time later, Sandra heard Koepsel's voice as he came downstairs. He had penis-to-vagina intercourse with her, then went back upstairs; Sandra was still unable to move. After the sexual assault, Marcell Jones carried Sandra upstairs and attempted to clean her up. Dickerson demanded to know where Sandra's sister Jane was. Sandra could not give the precise location, so Koepsel, Jones, and

---

[1] The victims in this case are sisters with nearly identical initials. To avoid confusion, the State used pseudonyms, Sandra and Jane, in its brief. *See* WIS. STAT. RULE 809.86(4) (2019-20). We will use the same pseudonyms in this opinion.

All references to the Wisconsin Statutes are to the 2019-20 version unless otherwise noted.

2

Guerra put her in a shopping cart and wheeled her around the area until she could point out Jane's location. The men then took Sandra back to her house.

¶3 Jane told police that she also owed Dickerson money. During the time in question, Koepsel came over and asked if she wanted to smoke with him. She said no. Koepsel then asked if she wanted to know where her sister was. She said yes, so Koepsel took her to the house. Dickerson told Koepsel and Guerra to take Jane to the basement, where they began hitting her with a two-by-four and a chunk of concrete. When the men stopped and took Jane upstairs, she was able to escape and call police.

¶4 Jane had suffered a gash on her face requiring ten stitches. Sandra sustained life-threatening injuries, including a lacerated spleen, a lacerated liver, and kidney failure. She also suffered several broken bones and contusions and needed stitches to close multiple wounds. At trial, Sandra told the jury she had to have multiple surgical procedures, including amputation of her right index finger.

¶5 Sandra described Koepsel to police as having red hair and a swastika tattoo on his shoulder, and she identified him through a photo array. Koepsel, the other three men, and Dickerson's driver Keith Fleming were each charged with one count of first-degree reckless injury for Sandra's injuries and one count of substantial battery for Jane's injuries; each charge carried the party-to-a-crime modifier and the dangerous weapon penalty enhancer. Koepsel was also charged with second-degree sexual assault.

¶6 Koepsel was arrested on August 3, 2016, and interrogated twice by police. The first interrogation session lasted less than thirty minutes and ended shortly after Koepsel made an apparent request for an attorney. In the second

interview, conducted approximately two days later, Koepsel gave "a narrative about what it is that had happened in connection with this case."

¶7     Koepsel moved to suppress "all statements, oral and written, allegedly made by [him] to law enforcement officers[.]"  He asserted that during the first interrogation, he had "made a clear request for an attorney and indicated his desire not to answer questions without his lawyer present."  He further stated that he "did not reinitiate questioning nor did he knowingly and intelligently waive his right to have his attorney present during questioning."  Because he was "denied his right to consult with his lawyer before the second interrogation began," he argued that his statements must be suppressed.  Koepsel also moved to suppress Sandra's identification of him through the photo array and any derivative in-court identification, arguing the array had been impermissibly suggestive because his was the only photo with red hair and a goatee.  The trial court heard testimony relative to both issues, made credibility and factual findings, and ultimately denied both motions.  Further relevant details will be discussed herein.

¶8     The jury convicted Koepsel on the reckless injury and battery offenses as charged.  The jury did not convict Koepsel of second-degree sexual assault, but did convict him of the lesser-included offense of fourth-degree sexual assault.  The trial court imposed concurrent and consecutive sentences totaling thirty years of imprisonment.  Koepsel appeals.

## DISCUSSION

¶9     A trial court's decision on a motion to suppress is reviewed in two steps.  *See State v. Roberson*, 2019 WI 102, ¶66, 389 Wis. 2d 190, 935 N.W.2d 813.  First, we uphold the trial court's findings of historical fact unless those findings are clearly erroneous.  *See State v. Arias*, 2008 WI 84, ¶12, 311 Wis. 2d

4

358, 752 N.W.2d 748. A factual finding is clearly erroneous if it is contrary to the great weight and clear preponderance of the evidence. *See id.* We then review *de novo* whether those facts warrant suppression. *See* **State v. Hampton**, 2010 WI App 169, ¶23, 330 Wis. 2d 531, 793 N.W.2d 901.

*Motion to Suppress Koepsel's Statements*

¶10 Koepsel's first interrogation was terminated shortly after he said, "I'm not talking no more about it until I have a lawyer or until the DA tells me that I'm not facing jail time." Koepsel does not challenge the admission of any portion of that first interview. Rather, he contends that he asserted his right to counsel in that interview and did not initiate contact with law enforcement thereafter, so any statements from the second interview were obtained in violation of his rights and must be suppressed.[2]

¶11 "[O]nce an accused invokes his right to counsel … *the police must cease interrogation until counsel is present* unless the accused himself initiates further communication with the police." **State v. Stevens**, 2012 WI 97, ¶49, 343 Wis. 2d 157, 822 N.W.2d 79 (citing **Edwards v. Arizona**, 451 U.S. 477, 484-85 (1981)). When the accused initiates communication with police, "[t]hey may

---

[2] A heading in Koepsel's appellate brief actually states that he "asserted his right to remain silent." While the Fifth Amendment right to counsel, which applies before a charge is filed, is derivative of the Fifth Amendment right to remain silent, invoking the right to remain silent is insufficient to trigger the protections of the right to counsel. *See* **State v. Stevens**, 2012 WI 97, ¶¶67-68, 343 Wis. 2d 157, 822 N.W.2d 79. "[T]he suspect *must* invoke the right to counsel to assure that interrogation is not only terminated but also may not be resumed *except* at the personal initiation of the suspect." ***Id.***, ¶68.

proceed with custodial interrogation if the accused again is given a ***Miranda***[3] warning and again waives his ***Miranda*** rights." ***Stevens***, 343 Wis. 2d 157, ¶52.

¶12    There are two inquiries under the ***Edwards*** rule.  *See **State v. Conner***, 2012 WI App 105, ¶16, 344 Wis. 2d 233, 821 N.W.2d 267.  "First, we must determine whether the accused actually invoked his right to counsel."  ***Id.***  "Second, if the accused did indicate he wanted an attorney, we must determine whether he (a) initiated further discussions with the police, and (b) knowingly and intelligently waived the right he had invoked."  ***Id.***

¶13    In ***Oregon v. Bradshaw***, 462 U.S. 1039 (1983), the United States Supreme Court announced two different tests for determining whether a suspect has initiated a discussion or conversation with police officers.  *See **Conner***, 344 Wis. 2d 233, ¶26.  Under the test articulated by the ***Bradshaw*** plurality, a suspect initiates communication with law enforcement when he or she asks questions or makes statements that under the totality of circumstances "evinced a willingness and a desire for a *generalized discussion* about the investigation[.]"  *See **id.***, 462 U.S. at 1045-46 (emphasis added).  Under the four-justice ***Bradshaw*** dissent's test, a suspect must initiate a specific "dialogue *about the subject matter of the criminal investigation*."  ***Id.*** at 1053 (Marshall, J., dissenting)).  Our supreme court has thus far declined to adopt either ***Bradshaw*** test.  *See **State v. Hambly***, 2008 WI 10, ¶75, 307 Wis. 2d 98, 745 N.W.2d 48.  We need not choose between the tests here, because the result would be the same under either one.  *See **id.***; *see also **Conner***, 344 Wis. 2d 233, ¶26 n.6.

---

[3] *See **Miranda v. Arizona***, 384 U.S. 436 (1966).

¶14 Prior to the motion hearing, the trial court reviewed the recordings of both interviews. At the motion hearing, the trial court heard from three witnesses: Officer Danilo Cardenas, who reported that Koepsel initiated contact through him; Detective Timothy Behning, who led the second interrogation; and Koepsel himself.

¶15 Cardenas testified that he was on the cell block to deal with another prisoner when Koepsel called him over to his cell to ask, "[I]s anyone going to talk to me?" Cardenas said he would check. He learned that Koepsel had requested an attorney, so he returned and told Koepsel, "[S]omebody already talked to you. You requested an attorney so no one is going to talk to you anymore." According to Cardenas, Koepsel responded by saying, "[N]o, no. I want to talk to the detective." Cardenas then notified his lieutenant and filed a report about the encounter. On cross-examination, it was established—through Cardenas's use of his report to refresh his recollection—that he had actually gone to the cell block to obtain Koepsel's fingerprint.

¶16 Behning testified that he and Officer Andrew Wagner were assigned by a supervisor to interview Koepsel. Wagner took Koepsel to an interrogation room and left briefly before returning with Behning. When Behning entered, he said, "We were told you wanted to talk to us." Koepsel responded, "Yeah." There was a brief conversation about obtaining a fresh DNA sample, which Koepsel provided. Behning then read Koepsel his *Miranda* rights and asked Koepsel if he understood those rights. Koepsel said yes. Behning then asked Koepsel if he was "willing to talk" and answer questions. Koepsel again answered affirmatively.

¶17 Koepsel testified that he did not tell Cardenas he wanted to talk to detectives. He also said that he spoke with Wagner and Behning because he felt

he had no choice once they came to get him from his cell. He was unable to recall most of the other details he was asked about.

¶18    The trial court first made extensive credibility determinations. It found that Cardenas was "generally credible." Although the fact that Cardenas did not immediately recall that he had gone to obtain Koepsel's fingerprint did "undermine his credibility" somewhat, it was "not irreparably" damaged. The "key component" of Cardenas's testimony "that he does seem to have a concrete memory of is his interaction with the defendant and his interaction then with his lieutenant," which was bolstered by the fact that Cardenas had prepared a report. The trial court found Behning's testimony to be largely "credible and worthy of belief," noting that there did not seem to be much testimony that would undermine his credibility. With respect to Koepsel's testimony, the trial court noted there were "significant gaps in his memory, mostly having to do with the substance of both interviews." The trial court found it "difficult … to accept as completely credible Mr. Koepsel's testimony as to whether or not he reinitiated this encounter when he does not have a good memory of either" interview. Thus, Koepsel's testimony was "significantly less credible and significantly less worthy of belief."

¶19    The trial court also made numerous findings of fact. It found that, "in the broadest reading," Koepsel requested a lawyer in the first interview when he told the interviewer, "I'm not talking no more about it until I have a lawyer or until the DA tells me that I'm not facing jail time." The trial court further found that Koepsel asked to speak to detectives when Cardenas came to take his fingerprint. Cardenas told his lieutenant, and Behning and Wagner were then assigned to reinterview Koepsel. When Wagner brought Koepsel into the interrogation room, Wagner can first be heard saying, "[W]e'll talk about that in a second here[.]" Koepsel then says, "I didn't beat no one. I didn't rape nobody.

But I know who did." When Behning entered the room, he started off by saying, "We were told you wanted to talk to us." Koepsel said, "Yeah." Behning collected DNA, then advised Koepsel of his *Miranda* rights. Koepsel acknowledged his understanding and waived those rights, expressing a willingness to talk to Behning. The trial court specifically found that "the terms of *Stevens* are met." *See id.*, 343 Wis. 2d 157, ¶¶49, 52. In short, the trial court's determination was that "Mr. Koepsel reinitiated the interrogation by the police, that he subsequently was reMirandized and waived those *Miranda* rights."[4]

¶20 On appeal, Koepsel does not allege that any of the trial court's specific findings were clearly erroneous, nor does he attempt to analyze this case under either *Bradshaw* test. Rather, he simply emphasizes those facts which he believes support a different conclusion.

¶21 Koepsel notes, for instance, that his "communication" with Cardenas was not recorded. However, Cardenas did not go to interrogate Koepsel, so it is unclear why Koepsel believes it significant that their interaction was not recorded. Koepsel asserts that the trial court found Cardenas's testimony was "inconsistent and impacted his credibility." While true, this assertion ignores the trial court's further findings that Cardenas was nevertheless generally credible and that his credibility was bolstered by his report. Koepsel insists that he did not initiate contact and that he felt he had no choice in speaking to Behning and Wagner.

---

[4] In the suppression motion, Koepsel asserted both that he did not initiate contact with law enforcement and that he did not knowingly and intelligently waive his rights in the second interview. On appeal, there is no developed argument regarding whether Koepsel validly waived his right. This court need not consider undeveloped arguments. *See State v. Pettit*, 171 Wis. 2d 627, 646-47, 492 N.W.2d 633 (Ct. App. 1992). However, we agree with the trial court's conclusion that Koepsel made a valid waiver.

However, Koepsel recalled almost nothing of his interviews, so the trial court simply did not believe Koepsel's denial and specifically found that no coercive police tactics had been used.[5]   Finally, Koepsel acknowledges that Behning reviewed his **Miranda** rights, but complains that the detective "did not specifically address the fact that he had previously requested counsel."   However, Koepsel cites no authority to show that Behning was required to do so.

¶22   Based on the trial court's factual findings and credibility determinations, none of which are clearly erroneous, Koepsel invoked his right to counsel but later initiated communication with the authorities, was properly reinformed of his rights, and waived those rights to speak with Behning and Wagner.   Accordingly, the trial court did not err when it denied the motion to suppress Koepsel's statements.

*Motion to Suppress the Out-of-Court Identification*

¶23   Sandra identified Koepsel from a photo array presented to her at the hospital.   Koepsel moved to suppress that identification, as well as "any subsequent or anticipated in-court identification" of him.   He claimed that the photo array shown to Sandra was "impermissibly suggestive to the defendant"

---

[5] While Koepsel asserts he felt he had "no choice" but to speak with Behning and Wagner, Koepsel did not develop a voluntariness challenge in the trial court. *See, e.g.*, **State ex rel. Goodchild v. Burke**, 27 Wis. 2d 244, 264-65, 133 N.W.2d 753 (1965).   There is also no developed **Goodchild** discussion on appeal. *See* **Pettit**, 171 Wis. 2d at 646-47.   However, we agree with the trial court that the record does not contain evidence of any coercive police conduct. *See, e.g.*, **State v. Hoppe**, 2003 WI 43, ¶37, 261 Wis. 2d 294, 661 N.W.2d 407 ("Coercive or improper police conduct is a necessary prerequisite for a finding of involuntariness.").

10

because "Koepsel is the only subject in the photo array that has both red hair and facial hair."[6]

¶24    "Out-of-court identification procedures implicate the defendant's right to due process." *State v. Drew*, 2007 WI App 213, ¶12, 305 Wis. 2d 641, 740 N.W.2d 404. "A criminal defendant is denied due process when identification evidence admitted at trial stems from a pretrial police procedure that is 'so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification.'" *State v. Benton*, 2001 WI App 81, ¶5, 243 Wis. 2d 54, 625 N.W.2d 923 (citations omitted).

¶25    In determining whether an out-of-court identification from a photo array should be suppressed, the defendant first has the burden to show the array was impermissibly suggestive.  *See Drew*, 305 Wis. 2d 641, ¶13.    An impermissibly suggestive procedure is one that makes it "all but inevitable" that the defendant would be identified.  *See Foster v. California*, 394 U.S. 440, 443 (1969).  Suggestiveness can arise in several ways, such as the manner in which the photos are presented, actions of the officer overseeing the process, or something in the photos themselves.  *See State v. Mosley*, 102 Wis. 2d 636, 652, 307 N.W.2d 200 (1981).  If the defendant meets this burden, then the State must show that the identification is nevertheless reliable under the totality of the circumstances.  *See Drew*, 305 Wis. 2d 641, ¶13.

---

[6] Koepsel also argued at the motion hearing that Sandra's identification was unreliable because her eyes were swollen shut and her orbital bone was broken, so she was unable to see. The trial court correctly noted that this was an argument about the weight, not the admissibility, of the identification.  Koepsel does not renew this argument on appeal.

¶26    As with the motion to suppress Koepsel's statements, the trial court made credibility and factual findings.    It determined that the detective who assembled the array was "credible and worthy of belief" despite two "episodes of casualness" regarding file maintenance.    The trial court noted that the issue in this case "only relates to the photographs themselves"; there was no suggestion of or support in the evidence for a claim "that there was any impropriety in the matter in which the photos were presented or displayed or any words or actions by the Detective … that would have [led] to suggestibility."

¶27    The detective had testified that in creating a photo array, the police typically go through around 250 photos to find filler images but here, because of Koepsel's red hair and pale complexion, there were not 250 photos to choose from.    The trial court noted that Koepsel, who was in position 4 of the reference sheet,[7] had very close cut hair, a "full goatee," and some facial injuries.    The trial court then described each of the filler photos, noting similarities to or differences from Koepsel's photo.    However, the trial court noted that each individual had "something unique about that photograph….    Each of the photographs for one reason or another stands out because of an individual characteristic."    While Koepsel's distinctive characteristics in this case were his red hair and goatee, the trial court noted that some of the others also had facial hair or had hair that was "qualitatively similar" in color to Koepsel's—which, the trial court observed, was not as distinctive in the photo as it was in person.

---

[7] The photo lineup process involves a "six-pack" reference sheet with a photo of the suspect and photos of five similar-looking filler subjects.    When the photos are shown to a witness, each photo is printed separately and placed in a folder; the folders are then shuffled and numbered, and two blank folders are added to the end.    This means that an individual's folder number may not be the same as the individual's position on the reference sheet.    The trial court referenced both numbers, but we refer only to the individual's position in the six-pack.

¶28 Ultimately, the trial court concluded that Koepsel's hair color in the photo was not "so pronounced in the photograph as to be distinctive or distinguishing …. I can't say that it is so distinctive in Mr. Koepsel that it stands out." Thus, the trial court concluded that Koepsel had not met his burden of showing the photo array was impermissibly suggestive and denied the motion.

¶29 On appeal, Koepsel asserts that the five filler photos "were so different … as to make the photo array impermissibly suggestive." He argues that "the fact that not one of the other five fillers had a goatee or significant facial hair made this photo array impermissibly suggestive" because his was a "distinct" and "pronounced" red goatee, which "set his photograph distinctly apart from the rest." We disagree.

¶30 Our supreme court in *Mosley* "decline[d] to assume that a unique identifying feature *ipso facto* is unduly suggestive, without more persuasive proof by the defendant[.]" *See id.*, 102 Wis. 2d at 654. While the photos in an array must be similar, they need not be identical. *See Powell v. State*, 86 Wis. 2d 51, 67, 271 N.W.2d 610 (1978). Koepsel is simply making an insufficient *ipso facto* argument. The trial court commented that the subject in position 5 seemed to have redder hair than Koepsel. We observe that the individual in position 6 does have facial hair that, while shorter, is not dissimilar from a goatee. We are unpersuaded

that the photo array was unduly suggestive; thus, we conclude that the trial court did not err in denying the motion to suppress.[8]

*By the Court.*—Judgment affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.

---

[8] Because we conclude that Koepsel did not meet his burden to show the array was unduly suggestive, we need not consider the State's argument that the out-of-court identification was nevertheless reliable. *See* **State v. Drew**, 2007 WI App 213, ¶13, 305 Wis. 2d 641, 740 N.W.2d 404; *see also* **Lake Delavan Prop. Co., LLC v. City of Delavan**, 2014 WI App 35, ¶14, 353 Wis. 2d 173, 844 N.W.2d 632 (only dispositive issues need be addressed). Also, while Koepsel further sought to suppress Sandra's in-court identification of him as tainted by the photo array identification, that argument necessarily fails because the photo array was not defective. We do note, however, that Sandra was acquainted with Koepsel prior to the assault.